IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

FILED

MAR 3 1 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

CLORINDA FABELA,                  §
                                  §
        Plaintiff,                §
                                  §
v.                                §            NO.  EP-09-CV-412-RPM
                                  §
MICHAEL J. ASTRUE,                §
Commissioner of the               §
Social Security Administration,   §
                                  §
        Defendant.                §

## MEMORANDUM OPINION AND ORDER

This is a civil action seeking judicial review of an administrative decision. Jurisdiction is predicated upon 42 U.S.C. § 405(g).  Both parties consented to trial on the merits before a United States Magistrate Judge.  The case was transferred to this Court for trial and entry of judgment pursuant to 28 U.S.C. § 636(c) and Appendix C to the Local Court Rules.

Plaintiff CLORINDA FABELA appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for benefits on the ground that she is not disabled within the meaning of the Social Security Act. After considering the briefs, the record evidence, the transcript of the administrative hearing and the ALJ's written decision, the Court finds the final decision of the Commissioner should be AFFIRMED.

## BACKGROUND

Plaintiff was born on January 22, 1959, making her 50 years old at the time of the

ALJ's decision.  (R. 98, 103, 19).[1]  Plaintiff went to school in Mexico until the sixth grade and later obtained her GED.  (R. 138, 322).  She speaks some English, but not well enough to conduct the administrative hearing In English.  (R. 22).  Plaintiff has past relevant work experience as a sewing machine operator.  (R. 25).  Plaintiff has not worked since September 1, 2002, when the plant where she worked was closed.  (R. 25, 131).

## PROCEDURAL HISTORY

On March 5, 2007, Plaintiff filed applications for disability insurance benefits ("DIB"), and for Supplemental Security Income ("SSI").  (R. 13).  Plaintiff  alleged disability since September 27, 2006[2], due to high cholesterol, high blood pressure, diabetes, carpal tunnel syndrome and depression.  (R. 98-109, 131).  On June 18, 2007, her applications were denied.  (R. 40-47).  She requested reconsideration and was denied again on August 30, 2007.  (R. 51-56).  On March 9, 2009, Plaintiff appeared with her attorney for an administrative hearing.  (R. 20-30).  The Administrative Law Judge ("ALJ") denied the application by written decision issued on June 1, 2009. (R. 13-19).  On September 11, 2009, the Social Security Appeals Council denied Plaintiff's request for review, thereby affirming the ALJ's decision as the final decision of the Commissioner.  (R. 1-4).

On November 10, 2009, Plaintiff filed a motion to proceed in forma pauperis with the filing of a complaint seeking judicial review of the administrative decision.  (Doc. 1).[3]  On

---

[1] Reference to the transcript of the record of administrative proceedings filed in this case, (Doc. 17), is designated by "R." followed by the page numbers.

[2] At the hearing, Plaintiff amended her onset date to February 6, 2007, the day following the ALJ's decision denying her prior application.  (R. 22-23).

[3] Reference to the documents filed in this case is designated by "Doc." followed by the docket entry number.

November 16, 2009, Plaintiff's motion to proceed in forma pauperis was granted, and her complaint was filed. (Docs. 5 & 7). On February 4, 2010, Defendant filed an answer. (Doc. 15). The following day, the transcript of the administrative proceedings was filed. (Doc. 17). On February 8, 2010, the District Judge entered an order transferring the case to the undersigned for all proceedings. (Doc. 18). On June 21, 2010, Plaintiff filed her brief in support of reversing and remanding the Commissioner's decision. (Doc. 25). On July 13, 2010, the Commissioner filed a brief in support of his decision to deny benefits. (Doc. 27). This matter is now ripe for decision.

DISCUSSION

A. Standard of Review

    This Court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence on the record as a whole, and whether the proper legal standards were applied in evaluating the evidence. **Myers v. Apfel**, 238 F.3d 617, 619 (5th Cir. 2001), **citing Greenspan v. Shalala**, 38 F.3d 232, 236 (5th Cir. 1994), **cert. denied**, 514 U.S. 1120 (1995). Substantial evidence is more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. **Richardson v. Perales**, 402 U.S. 389, 401,(1971); **Hames v. Heckler**, 707 F.2d 162, 164 (5th Cir. 1983).

    In applying the substantial evidence standard, a court must carefully examine the entire record, but may not reweigh the evidence or try the issues de novo. **Newton v. Apfel**, 209 F.3d 448, 452 (5th Cir. 2000); **Haywood v. Sullivan**, 888 F.2d 1463, 1466 (5th Cir. 1989). It may not substitute its own judgment "even if the evidence preponderates

against the Secretary's decision" because substantial evidence is less than a preponderance. **Harrell v. Bowen**, 862 F.2d 471, 475 (5th Cir. 1988). Conflicts in the evidence are for the Commissioner and not the courts to resolve. **Spellman v. Shalala**, 1 F.3d 357, 360 (5th Cir. 1993). A finding of "no substantial evidence" will be made only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." **Abshire v. Bowen**, 848 F.2d 638, 640 (5th Cir. 1988). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. **Spellman v. Shalala**, 1 F.3d at 360.

B. Evaluation Process and Burden of Proof

An individual applying for benefits bears the initial burden of proving that she is disabled for purposes of the Social Security Act. **Selders v. Sullivan**, 914 F.2d 614, 618 (5th Cir. 1990). A disability is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the individual from engaging in substantial gainful activity. 42 U.S.C.A. § 423(d)(1)(A) (West Supp. 2010); 20 C.F.R. §§ 404.1505(a) & 416.905(a) (2010). Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1572(a)-(b) & 416.972(a)-(b) (2010).

Disability claims are to be evaluated according to a five-step sequential process. 20 C.F.R. §§ 404.1520(a) & 416.920(a) (2010). A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. **Greenspan v. Shalala**, 38 F.3d at 236. In the first step, it is determined whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(I) &

416.920(a)(4)(i) (2010). If so, the claimant is found not disabled regardless of her medical condition or her age, education and work experience. **Id.**

In the second step, it is determined whether the claimant's impairment is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii) (2010). If the impairment is not severe, the claimant is deemed not disabled. **Id.** If the impairment is severe and meets the duration requirement, the third step of the evaluation directs that the impairment be compared to a list of specific impairments in Appendix 1 to Subpart P of Part 404 of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii) (2010). If the claimant's impairment meets or equals a listed impairment, she is deemed disabled without considering her age, education or work experience. **Id.**

If the impairment is not on the list of specific impairments in Appendix 1, the fourth step requires a review of the claimant's residual functional capacity ("RFC") and the demands of her past work. 20 C.F.R. §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv) (2010). If she can still do this kind of work, she is not disabled. **Id.** If she cannot perform her past work, the fifth and final step evaluates the claimant's ability, given her RFC and her age, education and work experience, to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v) (2010). If she cannot do other work, she will be found to be disabled. **Id.**

The claimant bears the burden of proof on the first four steps of the sequential analysis. **Bowen v. Yuckert**, 482 U.S. 137, 146 n.5 (1987). Once this burden is met, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is capable of performing. **Anderson v. Sullivan**, 887 F.2d 630, 632 (5th Cir. 1989). The Commissioner may meet this burden by the use

5

of opinion testimony of vocational experts or by the use of administrative guidelines provided in the form of regulations. **Rivers v. Schweiker**, 684 F.2d 1144, 1155 (5th Cir. 1982). If the Commissioner adequately points to potential alternative employment, the burden then shifts back to the claimant to prove that she is unable to perform the alternative work. **Anderson v. Sullivan**, 887 F.2d at 632.

C. The ALJ's Decision

In his written decision, the ALJ found, as a threshold matter, that Plaintiff had acquired sufficient quarters to meet the insured status requirements through June 30, 2008. (R. 13, 15). Next, he found she had not engaged in substantial gainful activity since the amended alleged onset date of February 6, 2007. (R. 15). At step two, the ALJ determined Plaintiff has "severe" impairments of tendonitis, obstructive sleep apnea, major depression and a dysthymic disorder. (R. 15).

At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Appendix 1 to Subpart P of the regulations. (R. 15-16). In the fourth step, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform the full range of unskilled light work.[4] (R. 16-19). In making this determination, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of symptoms she alleged. He concluded, however, that her allegations regarding the

---

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Light work involves a good deal of walking and standing, or sitting with some pushing or pulling of arm and leg controls. If someone can do light work, he can also do sedentary work, unless there are additional limitations such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b) & 416.967(b) (2010).

intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. 18). The ALJ found Plaintiff's past relevant work as a sewing machine operator does not require the performance of work-related activities precluded by her RFC. (R. 19). Therefore, he determined at step four that Plaintiff was not disabled because she can perform her past relevant work as a sewing machine operator. **Id**.

D. Plaintiff's Claims

Plaintiff presents the following claims for review: (1) whether the ALJ erred in determining Plaintiff's mental residual functional capacity; (2) whether the ALJ erred by failing to find Plaintiff's carpal tunnel syndrome severe and in failing to recognize the limitations associated with that impairment; and, (3) whether the ALJ's determination that Plaintiff can perform her past relevant work is supported by substantial evidence. Plaintiff seeks reversal of the Commissioner's decision that she is not entitled to benefits, or, alternatively, a remand for further administrative proceedings.

E. Evidence Relevant to Claims

1. Testimony at the Administrative Hearing

On March 9, 2009, an administrative hearing was held. (R. 20-30). Judith Beard, a VE, was present at the hearing.  Plaintiff appeared, represented by her attorney, and testified, through an interpreter, to the following.  She has not worked since her last disability hearing.[5]  (R. 24).  She tried to go to college about three years ago, but was unsuccessful.  **Id**.  She receives food stamps and her sisters provide financial help.  **Id**.

---

[5] Plaintiff filed a prior application for benefits which was denied at the hearing level on February 5, 2007.  (R. 22).  Plaintiff then appealed from the administrative decision under cause no. EP-07-CV-210-PRM.  On September 20, 2008, the decision denying benefits was affirmed by this Court.

Plaintiff testified her health gradually has worsened since the time of her previous hearing. (R. 24-25). She is very tired and has problems concentrating and remembering. (R. 25). She also has problems with her hands and swelling in her joints and tendons. **Id**.

The VE testified Plaintiff's past relevant work ("PRW") as a sewing machine operator is classified as unskilled work performed at the light exertional level. **Id**. In response to the ALJ's question, Plaintiff testified she left that job because the company where she was working was shut down. **Id**. She quickly added that she was "about to leave" because she was unable to continue working. **Id**.

Plaintiff testified she is under the care of three doctors and receives treatment for depression and a sleep disorder. (R. 26-27). The sleep machine she uses helps "a little bit." (R. 27). She takes medication for high blood pressure, diabetes, high cholesterol and her nerves. **Id**. She also takes pain medication for her knees, shoulders and wrists, and it helps. **Id**.

Plaintiff stated she has trouble remembering things. **Id**. She loses things around the house and forgets to bring home the items she purchases at the store. **Id**. She sometimes drives her daughter to school when her sisters are unavailable to do so, and "a long time ago" she passed the school and went in the wrong direction. (R. 27-28). She also has run several red lights, and this frightened her daughter. (R. 28). She is constantly confused and has trouble responding when people speak to her. **Id**. Plaintiff stated she went through a divorce because she was not able to work as her husband demanded. **Id**. She has a credit card, but she doesn't have any money of her own. **Id**. Her sisters give her money. **Id**.

8

Plaintiff testified she feels "very bad almost every day." Id. She feels tired and very sad. Id. When asked how she was doing that morning, Plaintiff replied, "I don't feel good today." Id. She testified she has a lot of side effects from the medication she takes. (R. 29). She experiences headaches, pain around her neck, upset stomach, colitis, frequent dizziness and constipation. Id. She has to lie down about three or four times during the day, but she is not able to sleep. Id. At night, with the machine and a pill, she sleeps a little bit, but then wakes up and is unable to return to sleep. Id.

2. Medical Records

Plaintiff was seen at Centro San Vicente clinic on March 8, 2005, for complaints of dizziness, weakness and a hoarse voice. (R. 251-252). She reported she had not slept well in five years and had been depressed for two years. The assessment included depression, diabetes mellitus, vertigo, and insomnia. Lab tests were ordered. The results were normal. (R. 203-205).

Plaintiff returned to the clinic on March 15, 2005. (R. 248). She reported being less upset and sleeping better. She requesting more Zoloft, and it was prescribed. She was to begin counseling and return for a follow up visit in two weeks.

Plaintiff was seen at the clinic on September 29, 2005. (R. 254-257). At that time, Plaintiff complained of being depressed because her daughter was going to college and she had problems at home. Her diabetes was noted to be stable. She wore a left wrist brace for carpal tunnel syndrome. She complained of headaches, and a CT scan of her head was ordered.[6]   The treatment plan included referral to an orthopaedist and an eye

---

[6]  It appears from the record that this test was not performed until June 7, 2007.

9

doctor. Psychiatric care was also recommended. She was to return in 6 weeks.

On October 3, 2005, Plaintiff was seen by Dr. Charles Zaltz, an orthopaedist, for a chief complaint of severe pain, discomfort, and numbness and tingling in both hands. (R. 224). The diagnosis was probable bilateral carpal tunnel syndrome, more severe on left than right. Her examination showed mildly positive Phalen's test[7] on both hands. She was to undergo electromyography (EMG) and nerve conduction studies.

On October 5, 2005, Dr. Angelo Romagosa examined Plaintiff and reported the results of the EMG and nerve conduction studies. (R. 216-218). He noted decreased sensation over the palm side of the right thumb. Tinel's test[8] was negative at the wrist bilaterally. Her reflexes were +2. She exhibited 4/5 strength throughout the upper extremities. Dr. Romagosa noted this was limited by pain and "a submaximal effort." The EMG study was abnormal with evidence of median mononeuropathy at the right wrist and carpal tunnel syndrome with evidence of demyelination. There was no evidence of median mononeuropathy at the left wrist.

Plaintiff was evaluated on October 7, 2005, by Robert Rosen, M.D., for complaints of blurred vision, dizziness, and ocular diabetes. (R. 215, 630). His report shows she was "doing well with minimal hypertensive and diabetic retinopathy, the earliest of cataracts, and no major problems." New glasses were prescribed, and she was advised to return for an annual eye exam.

---

[7] Phalen's maneuver is used for the detection of carpal tunnel syndrome. DORLAND'S ILLUS. MEDICAL DICTIONARY 1045 (29th ed. 2000).

[8] Tinel's sign is a tingling sensation in a distal end of a limb when percussion is made over the site of a divided nerve. It indicates an irritated nerve. DORLAND'S ILLUS. MEDICAL DICTIONARY 1644 (29th ed. 2000).

10

Progress notes dated October 10, 2005, by Dr. Zaltz indicate Plaintiff's EMG and nerve conduction study were positive for carpal tunnel syndrome on the right side. (R. 656-657). Naprosyn, 250 mg., was prescribed, and she was fitted with a brace. She was to return in six weeks. The records, however, do not show any further treatment by Dr. Zaltz until September 25, 2006. (R. 272-273).

On December 1, 2005, Plaintiff was seen at the clinic for a follow up visit and to obtain test results. (R. 240-241). Her diabetes was noted to be stable. She reported she continued to have crying spells.

On February 21, 2006, Plaintiff was evaluated at El Paso Mental Health/Mental Retardation ("EPMHMR") for outpatient mental health services. (R. 488-489). She reported a long history of depression that had become worse in the past 4 years. She described feeling sad and depressed most of the day with frequent crying spells. She has no energy and doesn't enjoy activities that she once enjoyed. It was noted she lost her job in 2002 when the factory where she worked was closed, leaving her with inadequate finances and health care services. Her GAF was rated at 48.[9]

On March 8, 2006, Plaintiff underwent a psychiatric evaluation by Cecilia Garcia, Ph.D., a psychologist at EPMHMR. (R. 481-487). Plaintiff's appearance and eye contact were rated good. She exhibited no inappropriate behavior, peculiar gestures, posturing or abnormal motor behavior. Her mood was depressed. Her thought processes were logical

---

[9] The Global Assessment of Functioning Scale is used to rate overall psychological functioning on a scale of 0 to 100. A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

and coherent with no delusions, no suicidal or homicidal ideation, and no visual or auditory hallucinations. She had no deficits in perception, and she was oriented to time, person, place and situation. Her insight and judgment were rated good. Her attention was fair. There were no deficits in her recent, remote and immediate memory. The assessment was major depression, recurrent, severe without psychotic features. Her GAF score was 50. She was started on Wellbutrin XL, 150 mg., and Trazodone, 50 mg. (R. 595).

Records from EPMHMR show Plaintiff was seen in May and June of 2006. Her GAF remained at 50. (R. 472-477).

On June 1, 2006, Plaintiff was seen at the health clinic for a follow up visit. (R. 235-236). Her diabetes, hypertension, and depression were all noted to be stable. She was to continue on her medications and return in 3 months.

Plaintiff was seen at EPMHMR in July, August and September of 2006. (R. 452, 466-471). Her GAF remained at 50, and she was reported to be improving with medication. She expressed being unable to handle caring for herself and her sick husband. Rehab services were offered, but Plaintiff declined because she was planning to enroll in school to obtain her GED. Her medications were adjusted.

On September 5, 2006, she was seen at the clinic for a follow up. (R. 232-233). Her diabetes and depression were noted to be stable.

On September 25, 2006, Plaintiff was seen by Dr. Zaltz for complaints of pain and numbness in her hands and tingling in her fingers that also woke her at night. (R. 272-273). She reported pain that radiated all the way up her arms towards her neck, particularly on the left side of her neck. She was taking Tylenol and Advil intermittently, but they were not helping.

12

Upon examination, Plaintiff demonstrated no neurological deficits in her upper extremities. She had a positive Phalen test and a positive Tinel test with proximal radiation of pain all the way up to her neck. Dr. Zaltz suspected left carpal tunnel syndrome. Vitamin B6, hydrochlorothiazide and ibuprofen were prescribed, and Plaintiff was to undergo EMG testing with Dr. Romagosa.

A Medical Source Statement of Ability to Do Work-Related Activities (Mental) was completed on September 27, 2006, by Dr. Cecilia Garcia at EPMHMR.  (R. 788-790).  Dr. Garcia checked the boxes to indicate Plaintiff had marked impairment in her ability to understand and remember both short, simple instructions and detailed instructions.  She also indicated Plaintiff had marked impairment in her ability to carry out detailed instructions. Dr. Garcia indicated Plaintiff was moderately  impaired in her ability to carry out both short simple instructions and detailed instructions and in her ability to make judgments on simple work-related decisions.  In support of this assessment, Dr. Garcia wrote Plaintiff is treated for major depressive disorder which affects her sleep, appetite, concentration and memory, and causes increased anxiety and decreased interest.

In the next section, Dr. Garcia indicated Plaintiff had marked impairments in her ability to interact appropriately with the public, co-workers and supervisors, as well as in her ability to respond appropriately to work pressures in a usual work setting and to respond to changes in a routine work setting.  However, in the space provided, Dr. Garcia did not provide any support for this assessment.  Finally, she indicated Plaintiff retained the ability to manage benefits in her best interest.

On October 4, 2006, an EMG and nerve conduction study was performed on the left median nerve to evaluate Plaintiff's complaints of pain, tingling and numbness to her left

13

arm up to the cervical spine. (R. 271, 279-281).  The results were normal.  There was no evidence of median mononeuropathy at the left wrist.

On October 16, 2006, Plaintiff was seen by Dr. Zaltz for a follow up visit regarding the EMG and nerve conduction study to her left wrist. (R. 269-270).  Her condition was the same. She reported awakening at night with numbness and tingling in her hands. Dr. Zaltz noted Plaintiff's symptoms historically represented carpal tunnel syndrome, but the EMG and nerve conduction study did not show anything.   She also complained of discomfort around left elbow and some lumps in the skin. He detected no difference between her right and left arms on palpation.  She was to continue taking an anti-inflammatory agent and return as needed.

Plaintiff was seen for a follow up visit at the clinic on December 19, 2006.  (R.  230-231). The assessment was depression, hypertension, diabetes and high cholesterol.  The plan was to return in 3 months.

EPMHMR Progress notes dated January 3, 2007, indicate Plaintiff reported she was doing much better.  (R. 451).  She was taking medications as prescribed and tolerating them well. She was eating and sleeping okay, with occasional awakening during the night. She was alert and oriented in all spheres. Her speech was fluent, and her mood was neutral. She had good eye contact and her affect was appropriate to mood.  The plan was to continue with psychiatric services in order to maintain stability. Dr. Garcia rated Plaintiff's overall functioning at 7.  (R. 460).  Her GAF remained at 50.  (R. 459).

On February 28, 2007, Plaintiff was seen at EPMHMR. (R. 455-458). Her  GAF remained at 50, although her overall functioning was rated at 5. She was living with her sister due to her husband's abuse.

At a follow up clinic appointment for diabetes on March 6, 2007, physical exam findings were within normal limits. (R. 436-437). No dizziness, weakness, numbness, depression or anxiety were noted. Her hypertension was controlled. She was to return in 6 weeks.

On March 9, 2007, Plaintiff underwent an ultrasound to evaluate her complaints of abdominal pain. (R. 421-424). The impression was moderate fatty replacement to liver, otherwise, normal abdominal ultrasound.

Plaintiff returned to see Dr. Zaltz on March 11, 2007. (R. 266-267). She complained of discomfort in both arms, worse in the left. He stated unequivocally that "[s]he does not have carpal tunnel syndromes." He noted some swelling over dorsum of left wrist. There was no neurologic deficit in her arm, and her shoulders were normal. The diagnosis was tendinitis[10] of the arms which required the use of an anti-inflammatory agent. Ibuprofen, 400 mg., was prescribed.

Plaintiff was evaluated on April 11, 2007, for chronic constipation and lower left quadrant pain. (R. 361-362). She was alert, awake, oriented in all spheres, and in no acute distress. She was noted to be obese, standing 5 feet tall and weighing 170 pounds. Her physical examination was normal. Blood pressure was 130/72. All her peripheral joints had a normal range of motion. Laboratory tests were ordered, and depending on the results, a treatment recommendation was to be made in 2 months.

On April 17, 2007, Plaintiff was seen for a follow up at the clinic. (R. 434-435). She complained of mild pain to her low back that began 2 to 3 months earlier. X-rays of

---

[10] Tendinitis is inflammation of tendons and tendon-muscle attachments; called also tendonitis. DORLAND'S ILLUS. MEDICAL DICTIONARY 1797 (29th ed. 2000).

Plaintiff's sacrum and lumbar spine taken that day were normal, showing only osteopenia and small marginal spur suggesting osteoarthritic changes. (R. 415-416). Notes show Plaintiff's diabetes and hypertension were stable. Tylenol PM was prescribed, and she was to return in 2 months.

On April 25, 2007, Plaintiff was seen at EPMHMR. (R. 305-308). She was still living with her sister. Her GAF was reported at 50. Her overall functioning had increased to 7.

On May 25, 2007, Plaintiff underwent a consultative mental examination performed by Guido Barrientos, Ph.D., a state agency medical consultant ("SAMC"). (R. 321-324). Dr. Barrientos reported Plaintiff was driven to the interview by her daughter. She was in good contact with her surroundings and oriented to time, place and person. Her mood was relaxed, and her affect was restricted. Her speech was clear and her tone of voice was normal. She did not appear to be physically impaired. She reported she was married and lived with her spouse and two daughters. She last worked in 2002 as a sewing machine operator for a garment factory. She stopped worked because the factory closed, and she has not worked since.

Plaintiff's chief complaint was stated as follows, "I get and feel very tired. I cannot sleep. I want to cry all the time." She stated her problems with depression began in 1996 and were precipitated by marital problems. She has been in treatment for depression since 2005 at EPMHMR, and her treating psychiatrist is Dr. Cecilia Garcia. She denied hallucinations, delusions, and suicidal or homicidal ideation. Her main symptoms are lack of sleep, fatigue and frequent crying. She takes Wellbutrin XL, 150 mg., and Lorazepam, 2 mg.   She reported that she felt better when she was separated from her husband for 5 months.  She has not sought or attended marital counseling. She has no prior psychiatric history, no

suicide attempts, hospitalizations .

Plaintiff reported she is able to take care of her daily needs, such as dressing, bathing, washing, doing housework, cooking and other household tasks. She can go to the store and buy groceries. She can drive, but does not do it often.  She was described as "mentally competent" and "totally ambulatory." Her thought process was normal.  Her mood was tense, but she did not display other overt signs of depression or anxiety. Her sensorium and cognition were normal.  Her judgment and insight appeared restricted.  She did not, however, appear to be suffering from major depression. Rather, she was in conflict because a divorce would cause financial hardship.  She has not considered the possibility of returning to work.

Plaintiff's GAF was rated at 60.[11] The impression was chronic depression due to marital problems.  It was recommended that Plaintiff receive psychiatric care, medication and marital counseling. Dr. Barrientos also recommended vocational rehabilitation training so Plaintiff can return to work within her limitations.  He also stated she seems capable of caring for her daily needs and managing her own affairs and/or any benefits that might be payable to her.

Plaintiff was seen at the clinic on June 1, 2007. (R. 372-374).  She complained of headaches, dizziness and memory problems.  A CT scan of the head was ordered. She was

---

[11] A score of  51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational and school functioning (e.g., few friends, conflicts with coworkers). A score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

to follow up in one week.

On June 7, 2007, a Mental RFC Assessment was performed by Ralph Robinowitz, Ph. D., a SAMC. (R. 345-348). In the category of understanding and memory, Plaintiff was found to have no significant limitations in her ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions. She was found to have a moderate limitation in her ability to understand and remember detailed instructions.

In the category of sustained concentration and persistence, Dr. Robinowitz found Plaintiff was not significantly limited in the following areas: ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance and be punctual; ability to sustain an ordinary routine without special supervision; ability to make simple work-related decisions; and, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In the same category, Plaintiff was found to be moderately limited in her ability to carry out detailed instructions, and the ability to work in coordination with others without being distracted by them. Dr. Robinowitz found no significant limitations in the categories of social interaction and adaptation. These findings were confirmed at the reconsideration level by Dr. Richard Alexander. (R. 378).

That same day, Dr. Robinowitz completed a Psychiatric Review Technique Form. (R. 330-343). Dr. Robinowitz determined Plaintiff has an affective disorder consisting of major depressive disorder. In rating Plaintiff's functional limitations under the "B" criteria, he found Plaintiff has mild restriction of activities of daily living, mild difficulties in maintaining social

functioning, and moderate difficulties maintaining concentration, persistence or pace. She has never had an episode of decompensation. The SAMC further determined the evidence does not establish the "C" criteria.

In support of his findings, the SAMC noted Plaintiff has a history of depression since 2006 and is currently stable on medications. She goes to her appointments at EPMHMR every 2 months. At her consultative mental exam, she was oriented, alert, without hallucinations, delusions, suicidal or homicidal ideation, with intact cognition and fair insight and judgment. She is independent in all activities of daily living and is currently living with her sister, secondary to her husband's abuse. Plaintiff's dysthymic disorder is only due to her continued marital problems. Dr. Robinowitz' findings were confirmed at the reconsideration level by Dr. Richard Alexander. (R. 378).

On June 7, 2007, a CT scan of Plaintiff's head was performed to evaluate her complaints of headaches, blurred vision, dizziness, nausea and memory loss. (R. 357-358). The results were negative.

Plaintiff was seen at EPMHMR on June 20, 2007. (R. 301-304). Her GAF was 50, and her overall functioning was rated at 8. She was to return in 8 weeks.

Plaintiff was seen for a follow up visit at the clinic on June 21, 2007. (R. 369-371). She complained of headaches and loss of sleep. Her blood pressure and hypertension were noted to be stable. She was to return in 3 months.

On August 10, 2007, Plaintiff was seen at EPMHMR. (R. 536-537). She was well dressed and groomed, cooperative, oriented in all spheres, and her speech was fluent. She stated she had been "doing fine" and had been following her medication regimen. She denied any suicidal or homicidal ideation, but stated she had a "death wish" without a plan.

She also reported crying spells and restless sleep.

Plaintiff was seen at the clinic on September 26, 2007, for a complaint of headaches. (R. 428-429).  Her diabetes and hypertension were stable.  She was to follow up in 2 months,

On October 5, 2007, Plaintiff was seen at the Sonno Sleep Center for an evaluation by Dr. Genevieve Belgrave.  (R. 637-639).  The "problem list" included obstructive sleep apnea, insomnia, depression, hypertension and diabetes mellitus.  Plaintiff reported a long history of difficulty in initiating sleep, taking anywhere from one to three hours to fall asleep.  She wakes up 3 to 4 times nightly. She did not feel her fatigue interferes with her activities, but complained that during the day her mind is foggy, she can't think, and she gets headaches.   A sleep study was recommended.  It was explained to Plaintiff that her depression is the likely cause of her insomnia. Cognitive behavior therapy was discussed.

On October 10, 2007, Plaintiff was seen at EPMHMR.  (R. 551-554).  She reported high medication side effects, and Ambien was discontinued. Her overall functioning was rated at 5. Her GAF was 50.

On October 18, 2007, Plaintiff underwent an overnight sleep study, to evaluate her complaints of nocturnal arousals, snoring, witnessed apneas and excessive daytime fatigue.  (R. 640-641). The impression was mild obstructive sleep apnea.  She was cautioned that central nervous system depressants potentially exacerbate sleep problems. A repeat study with CPAP initiation and titration during sleep was suggested.

A prescription form dated October 26, 2007, and signed by Dr. Belgrave indicates Plaintiff has obstructive sleep apnea and insomnia, and is presently being evaluated.  Her medical problems have affected her memory and concentration, and she will need further

treatment. (R. 783).

Plaintiff met with her case manager at EPMHMR on October 29, 2007. (R. 532-533). She reported she was doing fine. She complained of headaches from her medications. She also reported being depressed and having crying spells. She stated she was having a lot of problems with her husband, who abuses her mentally. She reported some functional impairment with eating and sleeping.   She cried during the assessment, but was oriented in all spheres and maintained good eye contact.  She was noted to be making progress.

On October 30, 2007, Plaintiff met with a therapist at EPMHMR. (R. 531). Notes indicate she rated her symptom severity very high, at 9 out of 10.  She reported severe abuse by her husband, emotionally and sometimes physically.

On November 7, 2007, Plaintiff underwent a repeat study with CPAP initiation and titration. (R. 642-643).  On CPAP, the respiratory disturbance index was reduced to the normal range.  Based on this excellence response, it was recommended Plaintiff continue to use CPAP.

On November 7, 2007, Plaintiff was seen at EPMHMR. (R. 547-550). Her GAF was reported at 50.  Her overall functioning was rated at 5.  She was to continue with her medications and return in 8 weeks.

Plaintiff met again with her therapist at EPMHMR on November 8, 2007.  (R. 530). She reported being afraid her abusive husband will "do something" to her daughter.  Family violence counseling was recommended.

On November 20, 2007, Plaintiff was seen for a follow up at the Sonno Sleep Center. (R. 635).  She reported being slightly uncomfortable with the CPAP unit, but she felt she could get used to it.

21

Plaintiff was seen at the clinic for a follow up visit on November 26, 2007. (R. 426-427). She reported she was not having any headaches. Her physical exam was within normal limits.    She was to continue all medications and return in 3 to 4 months.

Plaintiff was seen for a follow up at Sonno Sleep Center on December 7, 2007. (R. 633). She complained of dizziness and vertigo during the day. But she admitted feeling more rested and having no daytime sleepiness with CPAP.  She expressed a desire to change to a different mask.

On February 1, 2008, Plaintiff was seen for a follow up at the Sonno Sleep Center. (R. 634). She reported she still felt very depressed. She admitted, however, to feeling more alert and refreshed with CPAP, with less fatigue and sleepiness. She reported having headaches periodically.

On February 11, 2008, her therapist at EPMHMR reported Plaintiff was making progress. (R. 753).

On March 24, 2008, Plaintiff was seen at the clinic for a follow up on her hypertension, diabetes and high cholesterol. (R. 697-698). Her conditions were noted to be stable.  She was to return in 3 months.

On March 26, 2008, Plaintiff was seen at EPMHMR. (R. 776-779).  She reported her mood was very depressed and anxious. Her GAF was rated at 20.[12] Her overall functioning was rated at 3 out of 10. It was noted she was eating okay, but was not sleeping well.

---

[12] A score of 11-20 indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

Despite the extremely low GAF score, the notes indicate Plaintiff was neatly groomed and cooperative, with normal motor activity and normal speech.  Her thought process was goal directed.  She was alert, with fair judgment and insight.  Cognition was grossly intact, and there were no delusions, hallucinations, or suicidal or homicidal ideation.

On April 23, 2008, Plaintiff met with her case manager at EPMHMR and stated she was doing fine. (R. 743-744).  She was following her medication regimen and was not having any side effects.  She reported depression with crying spells and death wishes.  She was eating well, but not sleeping well.  She is going through a divorce and is staying temporarily with her sister.  She has low energy and motivation.  She feels her bones hurt.  She has been to a doctor to see if anything is wrong.  All tests have come back negative.  Plaintiff was oriented to time, place and person with fluent speech.  She was appropriately dressed and cooperative.  Her mood was "undetermined."  The case manager opined there had been progress towards achieving the goal of improving individual coping skills.

That same day, at her outpatient visit, Plaintiff's GAF was reported to be 30.[13]  (R. 772-775).  Her overall functioning was rated at 3.  The mental status examination reflected Plaintiff was neatly groomed and cooperative, with normal motor activity and normal speech.  Her thought process was goal directed.  She was alert, with fair judgment and insight.  Cognition was grossly intact, and there were no delusions or hallucinations, and no suicidal or homicidal ideation.  She was to return in 4 weeks.

---

[13] A score of 21-30 indicates behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000).

Plaintiff was seen again as an outpatient at EPMHMR on May 28, 2008. (R. 768-771). On this visit, her GAF was rated at 25. Plaintiff reported symptom severity at 8 out of 10, but no medication side effects. Her overall functioning had increased to 4. Again, the mental status exam showed deficits only in mood (irritable, anxious and depressed) and affect (blunt and flat).

At her EPMHMR visit on July 23, 2008, Plaintiff's mood was reported to be a little better, but still sad. (R. 764-767). She was sleeping poorly because of apnea. Her concentration and energy were low. Her GAF was rated at 30, and her overall functioning was rated at 4. Again, the mental status exam findings did not conform to the low GAF. Although her mood was anxious and depressed, and her affect was blunt and flat, Plaintiff was neatly groomed and cooperative, with normal motor activity and normal speech. Her thought process was goal directed. She was alert, with fair judgment and insight. Cognition was grossly intact, and there were no delusions or hallucinations, and no suicidal or homicidal ideation. She was to return in 8 weeks.

Plaintiff was seen at the clinic for a follow up visit on July 28, 2008. (R. 695-696). Her physical exam was within normal limits, and her medical conditions were stable. She was to return in 3 months.

On August 22, 2008, Plaintiff was seen at the Sonno Sleep Center for a follow up. (R. 679). She reported feeling much better with CPAP. She was not having any daytime sleepiness. She did report feeling more depressed lately. She is seeing new psychiatrist, and is now on Lexapro.

Plaintiff was seen at EPMHMR on September 19, 2008. (R. 760-763). Her mood was very sad and she reported low concentration and energy. Her GAF was rated at 20. The

notes, however, show she was neatly groomed and cooperative, with normal motor activity and normal speech.  Her thought process was goal directed.  She was alert, with fair judgment and insight.  Cognition was grossly intact, and there was no suicidal or homicidal ideation.

When Plaintiff was seen at EPMHMR on October 17, 2008, her GAF remained at 20, and her overall functioning was rated at 4.  (R. 756-759). The mental status examination showed her mood was anxious and depressed, and her affect was blunt and flat.  Again, she was neatly groomed and cooperative, with normal motor activity and normal speech.  Her thought process was goal directed.  She was alert, with fair judgment and insight.  Cognition was grossly intact, and there was no suicidal or homicidal ideation.

At her EPMHMR appointment on November 8, 2008, Plaintiff informed she was now divorced and was coping with the change pretty well.  (R. 733-734).  She also stated her daughter hates her dad and was depressed for a while.  She and her daughter were referred to family counseling.  Additionally, Plaintiff was financially stressed due to the divorce and Christmas holidays.  She was referred to the food bank and was offered assistance with clothes. She was reported to be well and stable and progress was noted.

Plaintiff was seen again at EPMHMR on December 5, 2008.  (R. 751-752, 754-755). Her mood was depressed, with low concentration and low energy. Her eating and sleeping were reported to fluctuate. Her GAF was unchanged at 20. The notes, however, show she was neatly groomed and cooperative, with normal motor activity and  normal speech.  Her thought process was goal directed.  She was alert, with fair judgment and insight.  Cognition was grossly intact, and there were no hallucinations, delusions, or suicidal or homicidal ideation.

Plaintiff was seen at EPMHMR on January 30, 2009. (R. 747-750). Her GAF was rated at 25. Her overall functioning was rated at 5. The notes, however, show she was neatly groomed and cooperative, with normal motor activity and normal speech. Her thought process was goal directed. She was alert, with fair judgment and insight. Cognition was grossly intact, and there were no hallucinations, delusions, or suicidal or homicidal ideation. She was to return in 8 weeks.

A Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated February 20, 2009, by a general practitioner whose name is not legible indicates Plaintiff has slight limitation in her ability to understand, remember and carry out short, simple instructions, and marked limitation in her ability to understand, remember and carry out detailed instructions and to make judgments on simple work-related decisions. (R. 791-792). The medical/clinical finding given in support of this assessment is a comment that indicates Plaintiff's depression leads to decreased concentration, motivation and energy.

The check-box form further indicates Plaintiff has marked limitation in her ability to interact appropriately with the public, co-workers and supervisors, as well as marked limitation in her ability to respond appropriately to work pressures in a usual work setting and to respond to changes in a routine work setting. In support of this assessment is a comment that indicates Plaintiff has anxiety, lack of motivation and lack of energy.

E. Analysis of Plaintiff's Claims

1. The ALJ Properly Determined Plaintiff's Mental RFC

The ALJ determined Plaintiff has mild limitations in activities of daily living, mild limitations in social functioning and moderate limitations in concentration, persistence and pace. (R. 19). He observed Plaintiff's mental health issues have primarily focused on her

26

abusive ex-husband and situational domestic problems.  The ALJ found that while Plaintiff's

fatigue and depression may compromise her ability to sustain the mental demands of

detailed and complex work tasks on a sustained basis, she retained the ability to perform

routine and repetitive tasks competitively, such as those inherent in unskilled types of work.

(R. 18).

Plaintiff contends the evidence shows she has more than minimal limitations in

activities of daily living and social functioning. As evidence of greater limitations than

assessed by the ALJ, Plaintiff emphasizes that her response to treatment was up and down,

that is, she often had severe symptoms, minimal response to medications, suicidal thoughts,

crying spells, insomnia, a sad mood, difficulty with concentration, fatigue, lack of motivation

and anxiety.   Plaintiff argues the ALJ failed to properly consider the opinion of Dr. Cecilia

Garcia contained in the Medical Source Statement of Ability to Do Work-Related Activities

completed on September 27, 2006. (R. 645-646). According to Plaintiff, Dr. Garcia's opinion

is supported by the treatment records, as well as by a  Medical Source Statement of Ability

to Do Work-Related Activities in which another physician also assessed "marked" limitations

in most areas.  (R. 784).

In a Medical Source Statement of Ability to Do Work-Related Activities, Dr. Garcia

checked boxes to indicate Plaintiff has marked impairment in her ability to understand and

remember short, simple instructions and moderately impaired in her ability to carry out short,

simple instructions.  Dr. Garcia also indicated Plaintiff has marked impairment in her ability

to understand, remember and carry out detailed instructions and moderate impairment in

her ability to make judgments on simple work-related decisions.  (R. 645-646). Dr. Garcia

also found marked impairment in Plaintiff's ability to interact appropriately with the public, co-

workers and supervisors, as well as in her ability to respond appropriately to work pressures in a usual work setting and to respond to changes in a routine work setting.

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is familiar with the patient's condition, treatment and responses should be accorded considerable weight in determining disability. **Greenspan**, 38 F.3d at 237. However, the opinions of treating physicians are far from conclusive. **Id**. The ALJ has the sole responsibility for determining whether the claimant is disabled. **Id**. Accordingly, the ALJ may give a treating physician's opinion less weight, little weight or even no weight when the statements are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or are otherwise not supported by the evidence. **Id**; **see** 20 C.F.R. §§ 404.1527(d) & 416.927(d)(2) (2010).

The ALJ considered the Medical Source Statement completed in February 2009 by a general practitioner who assessed marked limitations in numerous domains due to mental factors. (R. 18). The statement was supported by brief conclusory notes, and not by any medical/clinical findings. The ALJ noted the opinion was outside the doctor's area of expertise and was not consistent with the evidence as a whole. As he is permitted to do, the ALJ afforded this opinion "scant evidentiary weight." **Greenspan**, 38 F.3d at 237.

The ALJ properly concluded Dr. Garcia's opinion in September 2006 was without substantial support from the other evidence of record and was contradicted by the contemporaneous treatment records. Therefore, the ALJ determined it was entitled to be afforded little weight. He noted that in January of 2007, Plaintiff was taking her medication as prescribed and tolerating it well, and she had reported being much better. He also referenced Plaintiff's expressed intention to enroll in school. (R. 452). Plaintiff attacks this

reference on the ground that she testified at the hearing that her attempt to return to school was unsuccessful. However, the ALJ did not rest his assessment on this fact alone.

Plaintiff's citation to evidence of her up and down treatment is insufficient to demonstrate error. The record also contains substantial evidence that, despite any setbacks, Plaintiff made progress in her mental health condition. In January and April of 2007, Dr. Garcia assessed Plaintiff's overall functioning at 7 out of 10. (R. 460-462, 305-308). In June 2007, Dr. Garcia indicated Plaintiff's overall functioning had improved to a level 8. (R. 301-304). In October and November 2007, Plaintiff was "making progress," despite her reports of marital and family problems. (R. 532-533, 547-550, 551-554). In February 2008, her therapist again reported Plaintiff was "making progress." (R. 753).

On many subsequent visits in 2008, when Plaintiff's level of overall functioning was assessed very low, the mental status examination reflected to the contrary. In fact, Plaintiff was neatly groomed and cooperative, alert, with fair judgment and insight, normal motor activity and speech, goal-directed thought processes, and grossly intact cognition. (R. 756-759, 760-763, 764, 767, 772-775, 776-779). By the end of 2008, Plaintiff was divorced and reported coping with the change pretty well. (R. 733-734).

Moreover, the opinion of Dr. Barrientos, a consultative examiner, provides substantial evidence for the ALJ's RFC assessment. As noted by the ALJ, Plaintiff reported to Dr. Barrientos that she stopped working when the factory where she worked was closed. She related an ability to engage in extensive activities of daily living and an ability to interact with people. Her fund of knowledge was good. Her memory was intact, and she had no difficulties recalling the chronology of events in her life. Dr. Barrientos found Plaintiff to be functional to a great degree, and he assigned her GAF at 60, which indicates an ability to work.

Plaintiff also complains the ALJ erred when he relied on the opinion of Dr. Barrientos without performing the detailed analysis of Dr. Garcia's opinion under the criteria set forth in 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2) (2010).  However, this analysis is required only "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." **Newton v. Apfel**, 209 F.3d 448, 453 (5th Cir. 2000). The opinion of a treating physician is not given controlling weight when it is inconsistent with other substantial evidence in the record. **Spellman v. Shalala**, 1 F.3d 357, 364-65 (5th Cir. 1993). However, Dr. Garcia's report did not constitute the sole medical evidence presented on the issue. **See Villa v. Sullivan**, 895 F.2d 1019, 1023-24 (5th Cir. 1990) (opinions of non-examining physicians may not provide substantial evidence when they constitute the sole medical evidence presented or when they contradict or are unsupported by findings of an examining physician). Because the ALJ relied on medical evidence from another examining source, he was not required to perform a detailed analysis under 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).  Accordingly, Plaintiff is entitled to no relief on this ground.

Plaintiff contends the ALJ's finding that she has a moderate limitation in concentration, persistence and pace is not accommodated in his RFC finding limiting her to routine and repetitive tasks, such as in unskilled work. In support, Plaintiff cites **Kiederling v. Astrue**, No. 07-2237, 2008 WL 2120154, at *7 (E.D. Pa. May 20, 2008), and **Jones v. Astrue**, No. H-09-0656, 2010 WL 1404124, at *12 (S.D. Tex. Mar. 31, 2010).  The **Jones** court stated the error in **Kiederling** was "not that a below-average ability in concentration, persistence and pace was inconsistent with a finding that claimant could perform simple, detailed work instructions" but that the ALJ's hypothetical question did not include a moderate limitation in concentration, persistence and pace. Plaintiff concedes the admittedly

more relevant **Jones** case interprets the holding of **Kiederling** somewhat differently than does Plaintiff.  The Court does not find Plaintiff's interpretation to be persuasive.

The ALJ's finding regarding Plaintiff's concentration, persistence and pace, used at steps two and three of the sequential evaluation, does not represent the his determination of her RFC at step four.  **See** 20 C.F.R. §§ 404.1520a(d)) & 416.920a(d).  The ALJ determined that, despite her limitation in concentration, persistence and pace, Plaintiff retained the mental RFC to perform unskilled work. (R. 18).  Substantial evidence supports this determination. When assessing the severity of Plaintiff's mental impairments, Dr. Robinowitz, a non-examining psychologist, found Plaintiff had moderate difficulty in maintaining concentration, persistence or pace. (R. 340). When assessing her mental RFC, however, Dr. Robinowitz found only moderate limitations in Plaintiff's ability to understand, remember and carry out detailed instructions and a moderate limitation in her ability to work in close proximity to others without being distracted by them.  (R. 345-346). He opined that limiting Plaintiff to "less than skilled work would be less stress and change" for her.  (R. 347).

Additionally, Plaintiff argues her PRW as a sewing machine operator was not "routine and repetitive" as performed by her. A determination that a claimant can perform her PRW may rest on descriptions of past work as actually performed or as it is generally performed in the national economy.  **Jones v. Bowen**, 892 F.2d 524, 527 n.2 (5th Cir. 1987) (citing Social Security Ruling 82-61).  In this case, the ALJ specifically stated that Plaintiff was able to perform her PRW as "it is generally performed in the national economy." (R. 19). Therefore, any reliance on how Plaintiff actually performed her PRW is irrelevant. Furthermore, DOT listing 786.685-030 for sewing machine operator indicates it is repetitive or short cycle work.

Plaintiff does not explain exactly how her moderate limitation in concentration, persistence and pace would prevent her from performing her PRW.  Unskilled work, by definition, "needs little or no judgment to do simple duties."  **See** 20 C.F.R. §§ 404.1568 & 416.968.  The ALJ's finding that, despite her mental limitations, Plaintiff retains the ability to perform routine and repetitive tasks on a sustained basis, such as those inherent in unskilled types of work sufficiently accounted for her moderate limitation in concentration, persistence and pace.

### 2. The ALJ Properly Assessed Plaintiff's Physical RFC

Plaintiff contends the ALJ erred by failing to find her carpal tunnel syndrome to be a severe impairment and failing to recognize the limitations associated with that impairment. In support, Plaintiff cites the following evidence. In October 2005, she complained of severe pain and numbness in her hands.  She had decreased sensation in her right hand, decreased strength in her upper extremities,  and an abnormal EMG study.  (R. 215-216, 224).  In September 2006, she continued to complain of pain, numbness and tingling, with pain radiating up her arms and into her neck. (R. 262).  Upon examination, she had a positive Phalen's test and a positive Tinel's tests.  **Id**.  In October 2006, she continued to complain of pain, numbness and tingling in her left arm and neck.  (R. 271).  In March 2007, she complained to Dr. Zaltz of major pain in her left arm, and examination revealed swelling around her left wrist.  (R. 260).  Further, Plaintiff testified at the hearing that she could not work due, in part, to problems with her hands.  (R. 25). Plaintiff contends that, based on this evidence, the ALJ should have found she suffers from severe carpal tunnel syndrome and should have included limitations from this impairment in his RFC finding.

As Plaintiff concedes, the record contains conflicting reports from objective medical

testing regarding the diagnosis of carpal tunnel syndrome. (R. 223, 261). In October 2005, an abnormal EMG showed carpal tunnel on the right. She had decreased sensation in the palm side of her right thumb. Strength in her upper extremities was less than normal at 4/5, however, submaximal effort was noted by Dr. Romagosa. ( R. 216-218). Tinel's test was negative at both wrists.

A repeat study performed in October 2006 showed no evidence of carpal tunnel syndrome on the left. (R. 279-281). On March 11, 2007, Dr. Zaltz diagnosed tendinitis in Plaintiff's arms and recommended the use of anti-inflammatory agents. (R. 260). Ibuprofen, 400 mg., was prescribed to be taken 3 times a day after meals. (R. 267). No further treatment was sought or recommended. The ALJ correctly noted Plaintiff is not currently considered to have carpal tunnel syndrome and has not pursued consistent or specialized treatment for any orthopedic problems. (R. 18). Substantial evidence supports this finding.

Plaintiff argues that if the ALJ had properly recognized the limitations associated with her impairment in his RFC finding, he would not have found her capable of performing her PRW as a sewing machine operator. As proof she cannot perform the job duties, Plaintiff relies on both her description of her PRW as requiring her to reach, handle, grasp or grab large objects 10 hours per day, and DOT job listing 786.685-030 which indicates a requirement of "constant" reaching, handling and fingering.

The Court rejects this argument. There is no evidence in the record that any medical provider placed limits on Plaintiff's ability to perform reaching, handling or fingering. As noted by the ALJ, Plaintiff is able to engage in a wide range of daily activities that are not limited to the extent one would expect given her complaints of disabling symptoms and limitations. (R. 18). Additionally, the ALJ correctly observed that Plaintiff left her past work

for non-disability related reasons, and the evidence fails to support that her condition has discernibly worsened since her last hearing. **Id**. Substantial evidence supports the ALJ's finding that, although the combination of Plaintiff's impairments limited her to light work, she did not have any specific manipulative limitations.

### 3. Substantial Evidence Supports the ALJ's Determination that Plaintiff Can Perform Her Past Relevant Work

Plaintiff complains the VE was not sworn in at the hearing, was not formally questioned by the ALJ, and Plaintiff's counsel was not given an opportunity to cross-examine the VE. Therefore, according to Plaintiff, the ALJ improperly relied on VE testimony as support for his conclusion that Plaintiff can perform her PRW as a sewing machine operator.

In his opinion, the ALJ stated the VE testified that Plaintiff's PRW was unskilled work performed at the light exertional level. (R. 19). The DOT listing confirms this. As the Commissioner points out, VE testimony is not required to support a step four decision. A step four determination may rest on descriptions of the claimant's past relevant work as actually performed or as generally performed in the national economy. **Villa v. Sullivan**, 895 F.2d 1019, 1022 (5th Cir. 1990). Therefore, any error related to the VE's testimony was harmless. **Mays v. Bowen**, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required. This Court will not vacate a judgment unless the substantial rights of a party have been affected."). Plaintiff has burden to show she cannot perform her PRW. **Bowen v. Yuckert**, 482 U.S. 137, 146 n.5 (1987) (The claimant bears the burden of proof on the first four steps of the sequential analysis). No error on this ground is shown.

34

## CONCLUSION

Based on the foregoing, it is therefore ORDERED that the decision of the Commissioner be, and it is hereby, AFFIRMED.

SIGNED and ENTERED this ___31st___ day of March, 2011.

_Richard P. Mesa_

RICHARD P. MESA
UNITED STATES MAGISTRATE JUDGE

35